## LINDE AIR PRODUCTS CO. v. STUART LABORATORIES, Inc., et al.

### Civ. A. No. 194–50.

United States District Court
D. New Jersey.

May 24, 1951.

As Corrected June 11, 1951.

Carlson, Pitzner, Hubbard & Wolfe, Richard Wolfe, and Richard L. Voit, all of Chicago, Ill., for plaintiff.

Cooke, Armstrong & Grant, Thomas T. Cooke, and James B. Grant, all of New York City, for defendants.

FAKE, District Judge.

This is a patent suit in which plaintiff alleges infringement of its U. S. Patent No. 2,488,507, covering a process for producing synthetic star rubies and star sapphires. The said star effect is known in the art as asterism. The patent also covers the product of the process; to wit, the synthetic asteriated or star stones.

Claim 5 is a typical process claim, and it reads as follows: "A process for developing asterism in massive nongranular single crystals of ruby and sapphire grown synthetically by Verneuil's procedure from an alumina powder containing as an essential ingredient 0.1% to 0.3% of $TiO_2$, said process comprising heating such a crystal at a temperature within the range between 1100° C. and 1500° C., and maintaining said crystal at a temperature within said range until titanium oxide precipitates out of solution."

Claim 19 is a typical article or product claim and reads as follows: "A crystal resembling, both in appearance and asterism, a natural star sapphire or ruby but composed of a synthesized mass of corundum and pigmenting material with included needle-like crystallites of a precipitated titanium compound oriented therein, the synthetic character of the crystal being detectable by curved growth lines which appear internally thereof as contrasted with the straight form of any growth lines which appear in the natural mineral crystals."

The complaint alleges that defendants are infringing the process as well as the product claims of the patent.

Defendants answering deny infringement and allege the invalidity of the patent.

The validity of the patent is attacked upon two grounds; that there is a failure in the patent fully to disclose the process, that is to say, the disclosure is insufficient to direct one skilled in the art to a successful manufacture of the product claimed, and that the patent is invalid for want of invention, in that it amounts to no more than what might be termed the next natural step in the art.

A careful study of the prior art discloses that synthetic unasteriated sapphires and rubies were manufactured and sold in France as far back as the year 1908, and continuously thereafter down to date. Shortly after World War II began, studies were started by the plaintiff, relating to the

use of synthetic sapphire and ruby stones in the mechanical arts, occasioned to a great extent, by a shortage of jewel bearings in this country and government pressure was exerted to supply these war wants.

As bearing on the prior art, the Verneuil process covered by United States patents No. 988,230 dated 1911, and No. 1,004,505, also dated 1911, are outstanding. Nowhere in the prior art is there anything to indicate a method or procedure under which star or asteriated gems could be produced. Prior to the patent in suit the world had only the plain unasteriated rubies and sapphires of synthetic origin.

The shop records show that in 1947, Burdick and Glenn, while working for plaintiff in its laboratory at Tonawanda, hit upon and discovered, while building up a boule under the teachings and with the equipment disclosed by Verneuil, that they could, by feeding a mixture of alumina and titanium dioxide in the ratio and in the manner disclosed in the patent, and by heating the same from 1100° C. to 1500° C., and holding it for two hours at 1500° C., or 72 hours at 1100° C., produce a boule in which the titania was caused to congregate on the crystals, thereof, in such a way as to result in asterism.

Therein is found the virtue of patentability as required by the patent law. The patent, however, is limited so as not to include anything disclosed by the prior art. The coverage must be confined to the limitations of the patent as clearly disclosed to one skilled in the art. In this connection, the rules bearing upon disclaimer must be kept in mind since to claim within the sphere of the prior art might result in invalidity or place a burden on the patentee to disclaim. 35 U.S.C.A. §§ 65, 71.

It is argued for the defendants that the process claims when read with the specification fail to disclose a process whereby asterism can be produced on a useful or profitable basis. The record shows that when manufacturing these gems in conformity with the patent there is a very large percentage of loss. The process is not an easy one to perform. Apparently, it requires experience and skill in the operation of the Verneuil boule burner. It appeared in this case that a professor of ceramics of Rutgers University was unable to produce asterism in attempting to follow the patent. The professor had had no prior experience in the operation of the Verneuil process for rubies or sapphires. It is my thought that his failure was caused by his lack of skill in the process and lack of experience in the field outside of his book knowledge.

Anyone at all familiar with a carpenter's hand plane knows that book learning alone will not permit him to plane a board without showing the marks of the blade. This is so, however complete the teaching may be. There is a feel, a touch, a timing, and a wrist control which the skilled carpenter acquires by practice. So here the skilled boule grower must have those aptitudes which plaintiff's inventors and others had attained or he is not skilled in the art. Thus equipped, the plaintiffs were able to and did produce star gems under the teaching of their patent and on a commercial basis. In one year they took in a sum of $400,000. While doing so, they suffered a large percentage of defective stones. This percentage of losses would seem to about parallel the defective stones found in nature. A representative of the Swiss Company, Djeva, called by defendant, testified that so far as he knew, the plaintiffs here were the first to produce synthetic asterism in rubies and sapphires. The conclusion, therefore, is reached that plaintiffs were the first in the field and that the teachings of the patent are sufficient to enable one skilled in the art of boule growing under the Verneuil procedure coupled with the teachings of the patent, to produce asterism in these gems within the heat and time ranges disclosed, and that a profitable percentage of the product will be of gem quality.

The defense has at considerable pains and study constructed devices for the instruction of the Court in that branch of the art, involved in the orientation of the boule in the growing thereof, and the splitting of the boule after completion (Exhibits D–31, 34, 40, 43, 44). Each of these devices seems to be predicated upon the idea that boules will always split along the same plane, and

the skin is uniformly exceedingly thin. The fact is, however, that they do not always split along the same plane, and the skin may be of varying thickness. As to this, the patent says: "After heat-treating the crystal as described above, a gemstone is cut en cabochon in such a way that the base of the gemstone is normal to the C-axis with the C-axis extending symmetrically follow through the center of the stone and through the center of its convex crown. The skin may be on either the base or the crown. A well-defined six rayed star centered in the crown of the stone is obtained by this manner of cutting. If desired, the asteriated gemstone can be cut so that less than six rays show, as by cutting the stone with the C-axis at an angle to, rather than coincident with, the normal to the plane of the base of the stone."

It is argued for the defense that plaintiff now practices what is called annealing, i. e., passing the boule through temperatures ranging as high as 1900° C. to 2000° C., and that such annealing is necessary to produce commercial results. The better view to take of this is that this additional step is in effect an improvement on the patent. It is no more than that since it is found that while plaintiff had a lesser degree of success, it actually did produce star effects commercially in the absence of annealing.

### Infringement

It appears in this case that the defendants through their Mr. Hugle worked at plaintiff's plant before the patent in suit was issued, and there learned plaintiff's operations directed toward processing these synthetic gems. Armed with such knowledge, and not being bound by any agreement not to compete, he assisted in forming the defendant corporation, opened a plant at North Bergen in New Jersey, and proceeded to manufacture synthetic star rubies and sapphires. In the processing at defendant's plant the teachings of Verneuil are followed largely, perhaps with some equivalents. The heat range of defendant runs up through 1100° C. to 1500° C., and on into 1900° C. to 2000° C. The gist of the patent, as has been seen, is involved with what actually takes place between 1100° C. and

1500° C. It is at that range that the star effect is produced. It would appear that when plaintiff runs its boules through 1100° C. to 1500° C., the star could be formed, to be dissolved, however, when running up to 1900° C. to 2000° C. In turn, however, to be restored when cooling between 1500° C. to 1100° C. on the way down. It, therefore, appears that defendants infringe when they function between 1100° C. to 1500° C. whether going up or down in the heat range.

It appears that the plaintiff now anneals or runs its boules up to 2000° C., having concluded just as the defendant did, that this annealing is beneficial in that it reduces fragmentation or splitting and thereby increases the net yield which is in effect, an improvement on the patent, and no more. This was not new in the art. Annealing up to 2000° C. had been practiced in the manufacture of plain rubies and sapphires, and the application of it here is but a step in the art evidenced by prior disclosure. See the specific teachings on this point in German Patent No. 711,293 dated September 29, 1941.

An order will be entered in conformity herewith.

Findings of Fact and Conclusions of Law

The ultimate and material facts are found by the Court as follows:

1. Plaintiff is, and has been since the issuance thereof, the owner of the entire right, title and interest in and to the patent in suit to Burdick and Glenn No. 2,-488,507.

2. The patent in suit claims synthetic asteriated corundum gem stones and a method of making them. These asteriated or star stones are colored in either blue or red to simulate respectively a sapphire or ruby. In either case the stone is a crystal of aluminum oxide colored by small percentages of pigmenting material. A bright six-rayed star appears in the stone when a light shines on it. This star effect is the result of tiny crystallites of titania precipitated within the host crystal and disposed in a fixed pattern within it.

3. The patentees were the first people in this art successfully to synthesize star rubies and star sapphires.

4. The Verneuil process for making unstarred synthetic rubies and sapphires had been known for more than thirty years, and had been widely practiced on a commercial scale during that period, particularly in Europe. During that time, natural star stones were highly prized and sold for as much as $1,000. per carat. No one prior to the present patentees succeeded in making them synthetically, although intensive research, particularly in Europe, had been devoted to efforts in that direction.

5. Plaintiff has marketed over a half million dollars worth of synthetic star stones at a wholesale price of up to $7.00 per carat but never less than $3.00 per carat.

6. It was believed prior to the entry of the patentees in the field that the star effect in natural ruby and sapphire was caused by crystallites of titania (rutile) within the host crystal, but no one had previously succeeded in synthesizing a stone of gem quality with such crystallites in it. No one knew how to get the titania in there in that form. The inventors in their activities first produced a star stone by accident, having been engaged at the time in an effort to produce a simplified procedure for making plain blue sapphire. Having stumbled on the star they proceeded to verify the prosess and ascertain its critical limits.

7. The synthetic star stones can readily be differentiated from the natural star stones by anyone expert in appraising gems. One reliable criterion is the growth lines. In the synthetic stones they are curved, in the natural stones they are straight.

8. The synthetic star stones produced by plaintiff were an immediate success in the trade, were widely regarded as a sensational achievement.

9. The inventors first produced a star stone in the early part of January 1947, and applied for patent on August 27th of that year. Shortly thereafter, plaintiff began commercial production of the stones. The patent was granted on November 15, 1949.

10. It is found as a matter of fact that it required patentable invention to produce the star stones described in the patent in suit.

11. The patent purports to describe and claims not only the synthetic stones but also a process for producing them. In that process boules are grown according to the process of Verneuil. As an essential ingredient, however, of the powder used in growing such boules from 0.1% to 0.3% of titania is used. The boules, after being so grown in a boule furnace, are subjected to a subsequent heat treatment in which the boules are maintained within the temperature range of 1500° C. to 1100° C. until precipitation of the titania as crystallites within the boule occurs (2 to 72 hours). Thereafter, the asteriated or starred boules are cut and polished into finished stones.

12. The Verneuil process is itself an inherently difficult one to practice. A high percentage of loss is always encountered with it whether starred or unstarred boules are being made.

13. The description of the process in the patent in suit can be used successfully by a person skilled in the Verneuil art of boule growing to produce synthetic star rubies and sapphires of gem quality. No higher percentage of failures will be encountered in its use than is customarily encountered in making highly pigmented unstarred stones.

14. The inventors disclosed all of what they believed to be the essentials of their process. There was no fraudulent withholding of information.

15. Annealing of the boules (heating to a temperature which is short of fusion to relieve strains) is not essential to the production of gem quality star stones. It is used by the plaintiff in its commercial production and no doubt contributes to lowering the cost of production. But it is not essential and, indeed, at the time of applying for patent was not determined to be a preferable procedure. In any event, annealing of corundum boules to relieve strain is conceded by defendants' expert to have been an expedient obvious to anyone skilled in crystallography.

16. Defendant Hugle was employed by plaintiff as plant chemist in its South Chicago plant at about the time the compounding of powders for star boules was begun there in 1947 on a commercial scale and

also at the time that heat treating was carried out there for star boules. While the application for the patent in suit was still pending in the Patent Office, Hugle left plaintiff's employ and aided in organizing defendant Stuart Laboratories, Inc., whose sole business has been the making and selling of synthetic star rubies and sapphires. Stuart was organized in January 1949, and the patent in suit issued the following November.

17. Defendants by their Answer conceded receipt of notices of infringement from plaintiff. This suit was instituted in March 1950.

18. Defendants have made and sold and are continuing to make and sell, synthetic star rubies and sapphires (principally the former), which are substantially identical with those described in the patent in suit. The star effect or asterism in them is caused by precipitated crystallites of titania (rutile) in them, arranged along the crystallographic planes of the host crystal of corundum and they are distinguishable from natural stones by their curved growth lines.

19. Article claims 8 through 15 and 19 of the patent in suit are infringed.

20. In producing their star stones, defendants grow boules by the Verneuil process. In the powder used for growing such boules they employ from 0.1% to 0.3% titania.

21. Defendants subject the completed boules to a temperature of between 1500° C. and 1100° C. for a period of several hours, sufficient to precipitate the titania in the boule. In a few early runs this was done as a separate heat treating procedure in which the boules were heated to approximately 1350° C., held there for several hours, and then allowed to return to room temperature. Thereafter, it was done as a part of an annealing cycle. In that cycle the boules are heated to about 1900° C., and held there long enough to relieve strain. Then their temperature is slowly lowered, the fire for the furnace being gradually cut back. During such lowering the boules are in the range of 1500° C. to 1100° C. long enough that the titania precipitates, a matter of several hours.

22. Process claims 1 through 7 and 16 through 18 of the patent in suit are infringed.

23. Synthetic blue sapphires and synthetic rubies, used as gems, were well known in the United States at the time the patent was applied for (August 27, 1947), and had been so known for years. These consisted of single crystals of aluminum oxide ($Al_2O_3$) colored in the making with compounds of iron and titanium (for the blue) and of chromium (for the red). Such crystals (colored or uncolored) are generically known as corundum, and the form in which they are grown is termed a "boule".

24. The star effect, in natural star stones, as was known for more than a year prior to the time of the application for the patent in suit, is produced by the diffraction of light striking the crystal of $Al_2O_3$, which contains, in addition to the colorants in solution, precipitated crystals in the rutile form of tatanium dioxide ($TiO_2$).

25. A seed, in this art, is a single crystal of aluminum oxide in the form of a piece of rod or boule which orients the boule in the same direction as the seed's orientation, by actually fusing with and becoming part of the boule crystal, in addition to supporting it.

26. Linde anneals only about 3% of their nonasteriated sapphire boule as a production practice, but substantially 100% of their asteriated boule, as a production practice.

27. The method of annealing employed by defendant is similar to that employed by plaintiff, and assists in preventing the boule from splitting.

28. It would be impractical to cool off from annealing in any ordinary commercial furnace, such as defendant's, without staying within the range of 1500° C. to 1100° C., for periods of time ranging from 4 to 24 hours, and so doing infringes the patent in suit.

### Conclusions of Law

I conclude as matter of law:

1. Burdick and Glenn Patent No. 2,488,507 is valid.

2. Burdick and Glenn Patent No. 2,488,507 is infringed by the defendant.